# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01039-SCT

*MISSISSIPPI TRANSPORTATION COMMISSION*

*v.*

*DENNIS McLEMORE AND TAMMY McLEMORE*

| | |
|---|---|
| DATE OF JUDGMENT: | 3/28/2001 |
| TRIAL JUDGE: | HON. MILLS E. BARBEE |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY SPECIAL COURT OF EMINENT DOMAIN |
| ATTORNEYS FOR APPELLANT: | RICHARD G. NOBLE |
| | HOLLAMAN MARTIN RANEY |
| | OFFICE OF THE ATTORNEY GENERAL BY: |
| | BILLY DON HALL |
| ATTORNEY FOR APPELLEES: | TAYLOR D. BUNTIN |
| NATURE OF THE CASE: | CIVIL - EMINENT DOMAIN |
| DISPOSITION: | REVERSED AND REMANDED -10/16/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This eminent domain case arises from the Special Court of Eminent Domain of DeSoto County, where a jury awarded Dennis and Tammy McLemore total compensation and damages in the amount of $1,370,000.  Because the testimony of Rip Walker, the McLemores' expert appraisal witness, fails to satisfy the *Frye* standard or the modified *Daubert* standard for the admissibility of expert witness testimony, the trial court erred in denying MTC's motion in limine and in admitting Walker's testimony.  The

judgment of the trial court is therefore reversed, and this case is remanded for a new trial, consistent with this opinion.

## FACTS

¶2. The McLemores owned 1,980 acres of land in DeSoto County, Mississippi. Responding to increased growth in DeSoto County and development in Tunica County, the Mississippi Transportation Commission ("MTC") planned to construct an interstate highway between U.S. Interstate 55 at Hernando and U.S. Highway 61 at Robinsonville. The proposed interstate crosses the McLemores' DeSoto County property. Because it was unable to obtain the required 174-acre portion of the McLemores' DeSoto County property ("McLemore property") through negotiations, the MTC instituted this eminent domain action.

¶3. Seeking to condemn the McLemore property for use in the proposed project, the MTC on November 30, 1999, filed a complaint for the organization of a Special Court of Eminent Domain in DeSoto County. After a trial, the jury returned a verdict in favor of the McLemores, and the trial court entered judgment on the verdict. The MTC subsequently filed a motion for judgment notwithstanding the verdict, remittitur, or a new trial, which the trial court denied. The MTC raises the following issues in this appeal:

    **I.**     **WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO APPLY THE *FRYE* STANDARD TO EXCLUDE THE UNRELIABLE TESTIMONY OF RIP WALKER, THE McLEMORES' EXPERT APPRAISAL WITNESS, WHEN THE COURT DENIED MTC'S MOTION IN LIMINE AND DENIED MTC'S MOTION FOR NEW TRIAL AND/OR REMITTITUR.**

    **II.**     **WHETHER THE JURY VERDICT WAS THE RESULT OF THE TRIAL COURT'S ERROR IN ADMITTING SPECULATIVE AND TOTALLY UNRELIABLE DAMAGE TESTIMONY BY THE McLEMORES' APPRAISAL WITNESS.**

**III. WHETHER THIS COURT WILL ABANDON THE *FRYE* STANDARD AND ENDORSE AND ADOPT THE *DAUBERT/KUMHO* STANDARDS SO THAT A TRIAL JUDGE CAN ENSURE THAT ALL EXPERT TESTIMONY AND EVIDENCE IS NOT ONLY RELEVANT, BUT RELIABLE.**

## STANDARD OF REVIEW

¶4. Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion. *Haggerty v. Foster*, 838 So. 2d 948, 958 (Miss. 2002). Moreover, a motion in limine should be granted only if "(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988). Furthermore, the admission of expert testimony is within the sound discretion of the trial judge. *Puckett v. State,* 737 So.2d 322, 342 (Miss. 1999). Therefore, the decision of a trial judge will stand "unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id.*

## DISCUSSION

¶5. The MTC argues that we should abandon the general acceptance test set forth in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), for determining the admissibility of expert witness testimony in favor of the rule stated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993), as modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). We agree. Walker's testimony failed to satisfy either the *Frye* standard or the modified *Daubert* standard; therefore, his testimony should have been excluded.

**I. ADOPTION OF THE *DAUBERT/KUMHO TIRE* RULE AS THE STANDARD FOR ADMISSIBILITY OF EXPERT WITNESS TESTIMONY**

¶6.     The analysis for admission of expert testimony is enumerated in the Mississippi Rules of Evidence, Rule 702, as amended on May 29, 2003. The amended rule states that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*

M.R.E. 702 (emphasis added). Rule 702, as amended, is identical to Rule 702 of the Federal Rules of Evidence.

¶7.     Under Rule 702, expert testimony should be admitted only if it withstands a two-pronged inquiry. *Kansas City S. Ry. v. Johnson*, 798 So. 2d 374, 382 (Miss. 2001). First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education. *Id.* (citing M.R.E. 702). Second, the witness's scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue. *Id.* In addition, Rule 702 "does not relax the traditional standards for determining that the witness is indeed qualified to speak an opinion on a matter within a purported field of knowledge." M.R.E. 702 cmt.

¶8.     Prior to its amendment earlier this year, the comment to M.R.E. 702 quoted the well-known *Frye* test, noting that Rule 702 did not "relax the requirement that the scientific principle from which the expert's opinion is derived 'must be sufficiently established to have gained general acceptance in the particular field to which it belongs.'" M.R.E. 702 cmt. (repealed 2003) (quoting *Frye*, 293 F. at 1014). Our previous cases recognize this Court's long adherence to the *Frye* rule despite the adoption of M.R.E. 702 and major changes in federal evidence law. *See, e.g.*, *Kansas City*, 798 So. 2d at 382 (citing *Gleeton v.*

4

*State*, 716 So.2d 1083, 1087 (Miss. 1998)).  In deciding  whether the field has gained "general acceptance," we have previously asked:

> Is the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion?  Where the answer to this question is in the affirmative, we generally will allow expert testimony.

*House v. State*, 445 So. 2d 815, 822 (Miss. 1984).   Further, we  have stated that "[t]he facts upon which the expert bases his opinion or conclusion must permit reasonably accurate conclusions as distinguished from mere guess or conjecture." *Hickox v. Holleman*, 502 So. 2d 626, 638 (Miss. 1987) (quoting *Kruszewski v. Holz*, 265 Md. 434, 290 A.2d 534, 540 (1972)).  However, we have made clear that under the *Frye* standard, "it is not necessary that one offering to testify as an expert be infallible or possess the highest degree of skill; it is sufficient if that person possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman." *Kansas City*, 798 So. 2d at 382 (quoting *Hooten v. State* 492 So. 2d 948 (Miss. 1986)).

¶9.    In 1993, the United States Supreme Court declared that the Federal Rules of Evidence supersede the *Frye* general acceptance test.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Despite this major change in federal evidence law, Mississippi has continued to apply *Frye*.  *See Kansas City*, 798 So. 2d at 382.

¶10.    In *Daubert*, the Court concluded that the "general acceptance" test is inconsistent with other evidentiary provisions that strive to prevent the admission of unreliable or irrelevant scientific testimony. *Daubert,* 509 U.S. at 589.   The  rigidity of the "general acceptance" test also conflicts with the liberal goals of the Federal Rules which include reducing the traditional barriers to opinion testimony. *Id.* at 588-

89 (quoting ***Beech Aircraft Corp. v. Rainey***, 488 U.S. 153, 169, 109 S. Ct. 439, 450, 102 L.Ed. 2d 445 (1988)).

¶11.    However, the Court determined that a federal trial court retains authority to review scientific evidence to determine admissibility. *Id*. at 589.    The trial court is vested with a "gatekeeping responsibility." *Id.*  The trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Id.* at 592-93.   Preliminary questions of witness qualifications, privileges and admissibility of evidence are resolved pursuant to Rule 104(a) and 104(b). *Id.* at 592.  The trial judge determines whether the testimony rests on a reliable foundation and is relevant in a particular case. *Id.* at 589.  There must be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592.  The party offering the expert's testimony must show that the expert has based his testimony on the methods and procedures of science, not merely his subjective beliefs or unsupported speculation. *Id.* at 590.

¶12.    Moreover, the Court in ***Daubert*** determined that abandoning the general acceptance test does not result in jury confusion from "absurd and irrational pseudoscientific assertions," since "[v]igorous cross examination, presentations of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 595-96 (citing ***Rock v. Arkansas***, 483 U.S. 44, 62, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987)).  If evidence is deemed insufficient for a reasonable juror to conclude that the position is more likely than not true, the trial court can direct a judgment or grant summary judgment. *Id.* at 596 (citing Fed. R. Civ. P. 50(a), 56).  These

6

well-established, traditional devices provide better safeguards than full exclusion of testimony which meets the standards of Rule 702. *Id.*

¶13.    The Court in *Daubert* adopted a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony. *Id.* at 592-94. The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 595. These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* at 592-94. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony. *Kumho Tire*, 526 U.S. at 151. The *Daubert* Court emphasized that the reliability inquiry contemplated by Rule 702 "is a flexible one." *Daubert*, 509 U.S. at 594. In *Kumho Tire*, the Court illustrated such flexibility in that:

> It might not be surprising that in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may not have ever interested any scientist. Nor, on the other and, does the presence of *Daubert's* general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

*Kumho Tire*, 526 U.S. at 151. Therefore, the Court determined that it could "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*" because "[t]oo much depends upon the particular circumstances of the particular case at issue." *Id.* at 150. Thus, the trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. That is, the *Daubert* factors should be considered "where they

7

are reasonable measures of the reliability of expert testimony." *Id.* Furthermore, neither *Daubert* nor the Federal Rules of Evidence requires that a court "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," as self-proclaimed accuracy by an expert an insufficient measure of reliability. *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed. 2d 508 (1997)).

¶14. The Court's holding in *Daubert* was specifically limited to scientific expert testimony since the testimony at issue in that case was "scientific" in nature. *Kumho Tire*, 526 U.S. at 147. However, the Court in *Kumho Tire* concluded that a trial court's basic "gatekeeping responsibility" applies to the admissibility of expert testimony based on "technical" and "other specialized" knowledge. *Id.* Analyzing the language of Rule 702, the Court concluded that the word "knowledge" and not the words that modify it "establishes a standard of evidentiary reliability." *Id.* at 148 (quoting *Daubert*, 509 U.S. at 589-90).

¶15. In addition, the Court in *Kumho Tire* noted that the evidentiary rationale that supports trial courts' gatekeeping responsibilities is not limited to scientific knowledge. *Id.* When stating opinions, an expert is given greater latitude than a lay witness under the assumption that an expert's opinion is reliably based on knowledge and experience particular to a chosen discipline. *Id.* However, whether testimony is based on professional studies or personal experience, the "gatekeeper" must be certain that the expert exercises the same level of "intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

¶16. Thus, to summarize, the analytical framework provided by the modified *Daubert* standard requires the trial court to perform a two-pronged inquiry in determining whether expert testimony is admissible under

Rule 702. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). The modified *Daubert* rule is not limited to scientific expert testimony - rather, the rule applies equally to all types of expert testimony. *Kumho Tire*, 526 U.S. at 147. First, the court must determine that the expert testimony is relevant - that is, the requirement that the testimony must "'assist the trier of fact' means the evidence must be relevant." *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (citing Fed. R. Evid. 702). Next, the trial court must determine whether the proffered testimony is reliable. *Pipitone*, 288 F.3d at 244. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the *Daubert* analysis is a flexible one. *Id. Daubert* provides "an illustrative, but not an exhaustive, list of factors" that trial courts may use in assessing the reliability of expert testimony. *Id.*

¶17. In applying the modified *Daubert* rule, Mississippi's federal courts have recognized that the gatekeeping role of federal trial courts is taken seriously. *Hammond v. Coleman Co.*, 61 F. Supp. 2d 533, 537 (S.D. Miss. 1999), *aff'd mem.* 209 F.3d 718 (5th Cir. 2000). Moreover, there is universal agreement that the *Daubert* test has effectively tightened, not loosened, the allowance of expert testimony. 61 F. Supp. 2d at 537.

¶18. *Daubert/Kumho Tire* analysis has been used to exclude a medical doctor's testimony on the cause of fybromyalgia. *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir. 1999). Because of the many types of experts and expertise, the application of *Daubert* is fact specific and appropriately uses relevant factors to determine reliability. *Id.* at 311.

¶19. After eliminating other possible causes, the expert in *Black* concluded that a fall at Food Lion was the cause of the patient's fibromyalgia. *Id.* at 314. This conclusion was based on an improper exercise in scientific logic and the unacceptable fallacy of post-hoc propter-hoc reasoning. *Id.* A scientifically

reliable conclusion on causation was not possible since the doctor did not know the exact process or factors triggering the disease. *Id.* A conclusion for which there was no underlying medical support was not vindicated by the use of general methodology in the medical field. *Id.* A "standard of meaningless high generality rather than boring in on the precise state of scientific knowledge in this case" could not render a proper determination. *Id.*

¶20.    The Fifth Circuit has applied *Daubert* to expert testimony in an eminent domain proceeding. ***United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Mississippi***, 80 F.3d 1074 (5th Cir. 1996). The district court refused to admit expert testimony of Rip Walker[1] and Rogers Varner regarding severance damages resulting from an exercise of eminent domain. The opinions were deemed "speculative and not based on reliable foundations" providing "no aid to the finder of fact in determining just compensation in this case." *Id.* at 1076 (citing 884 F. Supp. 224, 227 (N.D. Miss. 1995)). The experts expressed uncertainty about the extent of flooding on the property in the event of heavy rainfall resulting in the district court's decision that the burden to demonstrate a diminution in the value of the landowner's property was not met. *Id.* at 1077. This application of the reliability test was overly stringent. *Id.*

¶21.    The trial court's role as gatekeeper is not intended as a replacement for the adversary system. *Id.* The admission of expert assessment of value must be cautiously determined because of the expert's critical role in the evaluation of the strong interests of both property owners and governments in just compensation. *Id.* at 1077. Absent other grounds to exclude, an expert's testimony is presumptively admissible when

---

[1]This is the same Rip Walker as in the case at bar.

relevant and reliable.  *Id.*   Not entirely speculative, nor unreliable, the experts' testimony was not inadmissible because of their inability  to predict the extent of flooding.  *Id.*  at 1079.

¶22.     This Court has consistently refused to apply the reasoning of *Daubert* and its progeny in evaluating the admissibility of expert witness testimony under the previous version of M.R.E. 702.  *Kansas City,* 798 So. 2d at 382 (citing  *Gleeton v. State*, 716 So. 2d 1083, 1087 (Miss. 1998); *Crawford v. State*, 716 So. 2d 1028, 1046 (Miss. 1998);  *Polk v. State*, 612 So. 2d 381, 390 (Miss. 1992)).  While we concluded in *Humphrey v. State*, 759 So. 2d 368, 384 (Miss. 2000), that the *Frye* standard of general acceptance is "time proven," M.R.E. 702 was amended earlier this year, and the comment to the current rule states:

> [T]he Supreme Court clearly recognizes the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable.  This follows the 2000 adoption of a like amendment to Fed. R. Evid., 702 adopted in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993).  It is important to note...that the factors mentioned in *Daubert* do not constitute an exclusive list of those to be considered in making the determination:  *Daubert's* "list of factors was meant to be helpful, not definitive."  *Kumho*, 526 U.S. at 151.

M.R.E. 702 cmt.  Notably, the comment makes no mention of *Frye* or the general acceptance test.  Thus, the current version of Rule 702 recognizes that the  *Daubert*  rule, as modified, provides a superior analytical framework for evaluating the admissibility of expert witness testimony.

¶23.     Considering this Court's  recent May 29, 2003, adoption of revised Rule 702 with the additional language found in the federal rule, this Court today adopts the federal standards and applies our amended Rule 702 for assessing the reliability and admissibility of expert testimony.  This standard recognizes the distinction between lay and expert witnesses. Like the Federal Rules, our rules  grant wide latitude for experts to give opinions even when  the opinions are not based on the expert's firsthand knowledge or

observations. With a focus on relevance and reliability, this approach is superior to the "general acceptance" test in *Frye,* because the *Frye* test can result in the exclusion of relevant evidence or the admission of unreliable evidence.

¶24. The gatekeeping function of the trial court is consistent with the underlying goals of relevancy and reliability in the Rules. *Daubert* ensures that the relevancy requirements of the rules are properly considered in an admissibility decision. Rule 702 gives the judge "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire*, 526 U.S. at 158.

¶25. We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony. The modified *Daubert* test does not require trial judges to become scientists or experts. Every expert discipline has a body of knowledge and research to aid the court in establishing criteria which indicate reliability. The trial court can identify the specific indicia of reliability of evidence in a particular technical or scientific field. Every substantive decision requires immersion in the subject matter of the case. The modified *Daubert* test will not change the role of the trial judge nor will it alter the ever existing demand that the judge understand the subjects of the case, both in terms of claims and defenses. We are certain that the trial judges possess the capacity to undertake this review.

## II. ADMISSIBILITY OF RIP WALKER'S APPRAISAL TESTIMONY

¶26. The central issue of this appeal concerns a component of Walker's appraisal, referred to at trial as the 750-foot line of damage method ("750-foot line method"). Because it completely fails to satisfy the modified *Daubert* rule, we conclude that Walker's testimony was inadmissible. In addition, we also find that Walker's testimony fails to satisfy the requirements of the abandoned *Frye* rule.

## A.    APPLICATION OF THE MODIFIED *DAUBERT* STANDARD

¶27.    First, the Mississippi Rules of Evidence define relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. If the proffered evidence has any probative value at all, Rule 401 favors its admission. *Holladay v. Holladay* 776 So. 2d 662, 676 (Miss. 2000). That is, "the threshold for admissibility of relevant evidence is not great. Evidence is relevant if it has any tendency to prove a consequential fact." *Whitten v. Cox*, 799 So. 2d 1, 15 (Miss. 2000). Walker's testimony regarding damages and the methods he used in determining damages was clearly relevant in this eminent domain action. Therefore, Walker's testimony satisfies the first prong of the modified *Daubert* standard.

¶28.    Second, in our following reliability analysis we do not intend to set forth a generic checklist of factors that our state courts shall use in every instance where parties present expert witness testimony. Rather, we choose to follow the lead of the federal courts, using the illustrative *Daubert* factors for guidance and leaving the determination of which reliability factors are applicable in particular cases to the sound discretion of our learned trial judges. As our cases instruct, we review a trial judge's decision to admit expert witness testimony for abuse of discretion. *See Puckett v. State,* 737 So.2d at 342. Because the application of the modified *Daubert* rule is fact-specific, a review of Walker's trial testimony is necessary for our analysis. Walker used the 750-foot line method to determine the "after value" of a portion of the McLemores' property. Walker reasoned that the McLemore property abutting the proposed interstate right-of-way would be most affected by the proposed construction. Thus, Walker concluded that "there is a certain amount of [the McLemore] land . . . that would be less desirable and

13

consequently have less value that it did before." Based on this reasoning, Walker projected an imaginary area, "kind of a buffer between the interstate right-of-way and where the new construction would be,...that would be less desirable" after construction of the interstate.

¶29. In determining the boundary of the so-called buffer zone, Walker concluded that there is a certain distance from the right-of-way at which the proposed construction no longer has an adverse effect on the property's desirability. According to Walker, this point is at "a distance of . . . between five hundred and a thousand feet" from the proposed interstate right-of-way. Arbitrarily splitting the difference, Walker concluded that the McLemore property within 750 feet of the proposed interstate would be more adversely affected than the rest of the property. According to his subsequent calculations, Walker determined that the buffer zone area consisted of 317 acres. Consequently, under Walker's theory, these 317 acres suffered more damage than the rest of the McLemore property.

¶30. Prior to trial, the MTC submitted a motion in limine requesting that the trial court exclude Walker's anticipated testimony regarding the 750-foot line method. The trial judge denied the MTC's motion, reasoning that "[w]e are in . . . a new era of eminent domain . . . and . . . if there are experts who testify with some basis their opinions are to be weighed by the jury as is the credibility of their testimony." During the course of the trial, the MTC repeatedly objected to Walker's testimony regarding his 750-foot line method.

¶31. After describing to the jury his 750-foot line method and the results obtained from his calculations, Walker gave the following curious testimony regarding his appraisal method:

Q: Mr. Walker, is the method that you have performed this appraisal, is it according to generally accepted appraisals standards and you understand them?

14

A: Well, I think, I think that we have got some issues here with what those standards are. And my opinion is that we have got a situation that is fairly rare and new, especially – just eminent domain itself is new. But this is what I consider breaking new ground in that there is a situation here where I think there is no question that the after value is affected by this highway. And in determining how much you want to try to use accepted standards and methodology that has been in the past, but when this is maybe the first time that something like this has happened or at least the first time it has happened this particular way, there is problem with using methods that have been used in the past, because they just not there.

¶32. In addition, Walker testified to the following facts on cross-examination: (1) the method he employed in his appraisal is, to his knowledge, not printed in any textbook; (2) the method is not taught in seminars; (3) the 750-foot line method is unique to the McLemore appraisal; (4) the 750-foot line method is not "a principle of any kind"; and (5) the 750-foot line method was not taught in any of the courses Walker completed to obtain his appraiser's licenses in Mississippi, Tennessee, and Arkansas.

¶33. Unlike his expert testimony in *United States v. 14.38 Acres of Land*, Walker's testimony in this case is entirely speculative. None of the illustrative factors approved by the United States Supreme Court in *Daubert* and *Kumho Tire* weigh in favor of allowing Walker's testimony here. Therefore, it is clear that Walker's testimony was inadmissible and should have been excluded.

¶34. First, it is apparent that Walker's 750-foot line method has not been tested in the appraisal field since Walker himself testified that his appraisal method was unique to the McLemore appraisal. Moreover, it is clear that Walker's theory cannot be tested. Under the theory, there is some portion of the McLemore property that will be more adversely affected by the construction than the rest of the property. This portion abuts the proposed interstate and extends a distance of between 500 and 1000 feet onto the McLemore property. Walker concluded that this most affected portion of the property terminates at a distance of 750 feet from the interstate right-of-way. This theory cannot be tested since the location of the imaginary boundary line is not based on any principle. Walker merely split the difference between 500 and 1000 feet.

15

In other words, Walker could have chosen to locate the line at 813 feet or 698 feet instead of 750 feet. This theory is clearly not capable of being tested since Walker simply chose the 750-foot offset at random.

¶35.    Second, there is no evidence that Walker's theory has been the subject of any peer review. It is also evident from the record that the theory has not been the subject of any publication. Walker himself testified that the theory is not printed in textbooks or taught in courses and seminars.

¶36.    Third, there is a high potential rate of error associated with Walker's theory. Again, the key to Walker's theory is the placement of the imaginary buffer zone boundary line. There is no evidence that the location of this line is based on anything more than Walker's speculation. Thus, there is a very real and high potential for error associated with the 750-foot line method.

¶37.    Fourth, there is no evidence of standards that control the operation of Walker's 750-foot line method. As discussed, *supra*, Walker arbitrarily chose to use 750 feet as the offset instead of another random distance. In essence, Walker's speculation alone determines the location of the buffer zone boundary line; therefore, it is clear that there are, in fact, no standards that control this method.

¶38.    Finally, Walker himself testified the method was unique to the McLemore appraisal. If this method is peculiar to a single appraisal, that the appraisal community has not adopted this method. Therefore, it is clear that this theory is not generally accepted in the appraisal field.

¶39.    Walker's testimony was inadmissible under the modified ***Daubert*** standard since it wholly fails to comport with the non-exhaustive, illustrative list of factors set out in ***Daubert*** and ***Kumho Tire***. The trial court therefore clearly erred in admitting Walker's testimony. Because we reverse and remand this case for a new trial, we need not consider MTC's second assignment of error.

## B. APPLICATION OF THE ABANDONED *FRYE* STANDARD.

¶40. Although we expressly reject the *Frye* standard today, it should be noted that Walker's testimony was inadmissible even under the abandoned *Frye* rule. As we interpreted it, *Frye* stood for the proposition that expert testimony would be allowed only if it was based on a principle that was generally accepted in the particular field in question. Obviously, a theory or method is not generally accepted when it is unique to a particular situation, not taught or discussed in courses or textbooks, "breaks new ground," and is not used by other practitioners in that particular field. It is clear that Walker's testimony was inadmissible even under the abandoned *Frye* test. Therefore, even under the rule we abandon today, Walker's testimony should have been excluded.

## CONCLUSION

¶41. We conclude that Rip Walker's expert testimony regarding the "750-foot line method" was entirely speculative, failing to satisfy either the "*Frye* test" or our newly adopted "modified *Daubert* test," as set out in this Court's May 29, 2003, amendment to Rule 702, thus such testimony was inadmissible. Accordingly, we reverse the trial court's judgment and remand this case to the trial court for a new trial consistent with this opinion.

¶42. **REVERSED AND REMANDED.**

**PITTMAN, C.J., WALLER AND COBB, JJ., CONCUR. McRAE, P.J., EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND CARLSON, JJ., NOT PARTICIPATING.**